[L. A. Nos. 14652 and 14891. In Bank.—December 19, 1934.]

ELIJAH M. SMUCKLER, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Andrew J. Copp, Jr., for Petitioner.

Philbrick McCoy for Respondent.

THE COURT.—As indicated by the numbers accompanying the title hereof, two proceedings against the petitioner were presented before two different local administrative committees of The State Bar, the first terminating in a recommendation by committee number three that petitioner be suspended for a period of one year, which was reduced by the board of governors to a six months' period, and the second resulting in a recommendation by committee number nine that he be suspended for a period of two years to run consecutively with any other suspension, which latter recommendation was approved by the board of governors. The charges grow out of similar transactions and the response of petitioner, as well as his version of the attending circumstances is so nearly the same in each case that we have deemed it appropriate to consider the two causes together.

In the first proceeding the charges were that petitioner had violated rule 9 of the Rules of Professional Conduct in two particulars as follows: (1) commingling money belonging to his client with his own funds, and (2) failing to promptly report to his client the receipt of money belonging to him. The second charges the receipt of money by petitioner for his client and a failure to report its collection or to pay it over but instead the use thereof by petitioner.

Before considering the facts relating to the specific charges let us note certain facts common to both. Petitioner was admitted to practice law in March, 1923, but was employed at the time by the Title Insurance and Trust Company in its searching department, where he remained until some time in 1929, handling only a few professional matters during the hours he was not occupied in his regular work. During the year 1929, the title company adopted a policy

requesting its employees to devote all of their time to its interests· and to decline professional employment, as a result of which petitioner shortly after resigned his position and engaged in the practice of the law exclusively. During the time of his employment with the title company the petitioner won and enjoyed an excellent reputation for honesty and reliability.

Adverting now to the particulars of the first charges, we find that petitioner was employed by the Sanford Holding Corporation of New York City to collect from David Mendoza a claim for rental in the sum of $624.99 upon the understanding that petitioner was to receive as compensation one-half of the amount actually realized. Two hundred and eight dollars was collected on August 13, 1930, and $279.17 on November 5, 1930. Action was commenced in the Los Angeles municipal court, but it does not appear that summons was ever served and no judgment was secured. No further sums were paid by Mendoza. By reason of a contention on the part of Mendoza that he was only liable for two months' rental instead of three, the first check was held by petitioner until November 6th, at which time both sums were deposited by petitioner's secretary in a trust account opened by petitioner for such funds on July 9, 1930. By an error of the bank these sums were credited temporarily to Smuckler's personal account and the deposit slip placed among those belonging to the latter account. The error was corrected so far as credit was concerned on November 12th, but the deposit slip remained among those of the personal account. On April 4, 1931, and again on July 30, 1931, the Sanford Holding Corporation inquired by letter concerning the status of the collection, but apparently the only information they were given was contained in a letter dated August 27, 1931, which petitioner says was written by his secretary without instructions from him, and which, according to the secretary, was signed by her, and in which it was said that action was commenced on October 10, 1930, and should come to trial in November, 1931 Nothing more was done until along in May of 1932, at which time, Judge Pacht first spoke to petitioner, saying that he had had an inquiry concerning it from New York. Petitioner says that he looked for the file but that he could not locate it and did not find it until June 28th, by reason of the

fact that it had been inadvertently placed among what he termed "dead" files, and because, even there, it had been put under the letter "F" instead of "S". Furthermore, he did not discover the amount of the first collection until October, at which time he found a carbon copy of a letter between two long (usually termed legal size) papers. In this connection it should be noted that the deposit slip was not made out to carry the name of the client for whom the deposit was made, but only the number of the check. During May, 1932, the Sanford Holding Corporation referred the matter to an attorney who made demand upon petitioner for an accounting. On August 1, 1932, after two letters had been received from the attorney, petitioner forwarded him the sum of $140, or approximately one-half of the collection of $279.17, with the further statement that he recalled another payment the amount of which he had been unable to ascertain, and with the promise that as soon as he was able to determine the amount of the other collection he would remit the remainder. While accepting the sum as a credit, the attorney demanded a full statement of collections and a few days later, according to his testimony, at the suggestion of the Sanford Holding Corporation, wrote petitioner insisting upon payment of one-half the original claim together with $100 to compensate the attorney for his efforts. About November 2, 1932, in response to a telephone call from Raymond Tremaine, an examiner for The State Bar, petitioner called upon the former and related substantially the things testified to by him. At that time he offered Tremaine a check for $172.50, which together with the sum of $140 already paid, would amount to one-half of the original claim without deducting costs for the filing of the action. On November 19th petitioner mailed this amount to the attorney. A copy of petitioner's account under the heading of Trust Account No. 2 was introduced and disclosed that there were many times after the deposit of the two sums collected when petitioner did not have a sufficient balance to pay the Sanford Holding Corporation $244, or one-half of the money actually collected by him, which fact the petitioner said in his testimony before the board of bar governors was due to a mistake made by his secretary depositing $300 collected for another client in his personal account instead of in the trust account, and

that he subsequently paid the latter client out of the latter account.

The local administrative committee found that petitioner had commingled his client's funds with his own and that he had failed to promptly report the receipt by him of the money belonging to his client, and that he "failed and neglected to pay to his said client the said sum so collected, or any part thereof". In view of other findings by the committee which set out in detail the payments we have already mentioned made by petitioner in 1932, we must construe the quoted portion of the finding to mean that petitioner did not promptly pay to his client the sums collected or any portion thereof. Thus construed they are not inconsistent and are in keeping with the testimony. The board of governors approved the findings except to disapprove that one which said petitioner had commingled his client's funds with his own.

We may now turn to an examination of the evidence adduced in support of the charges in the second proceeding. During the latter part of 1929 and in the year 1930, Armino A. Campagna of New York City forwarded to petitioner two accounts for collection, one against Albert F. Gressler, upon which nothing was collected and which does not enter into consideration again except incidentally in connection with the files, and the other against Max Scheck in the sum of $1,004.60, the same being for rentals. On April 5, 1930, petitioner commenced an action against Scheck for the amount last mentioned, and pursuant to an assignment of the claim to Myrna Sallo, in the municipal court of Los Angeles. Just prior to May 1, 1930, petitioner agreed with counsel representing Scheck to compromise the claim upon payment by the latter of $600 in four equal monthly installments. This settlement was subsequently confirmed by the client upon the further understanding that petitioner should accept $200 as his compensation instead of the one-half previously agreed upon. Scheck paid as follows: May 3, 1930, $150; June 3, 1930, $150; and July 3, 1930, $150. The fourth and final payment was never made and, as a consequence, on October 7, 1930, petitioner took judgment against Scheck for the full amount of the claim less the sum of $450 paid thereon. The first installment was received by petitioner personally. The others were probably

received by his secretary. All were deposited in petitioner's account at the bank. No evidence was introduced concerning whether the balance maintained in this account was sufficient at all times to pay the client the amount belonging to him. However, testimony was adduced tending to indicate that petitioner would have been loaned $450 at any time had he made application therefor. Nothing further was done about the matter until September, 1932, at which time Mr. Campagna wrote the Los Angeles Bar Association asking it to investigate. The letter was referred to The State Bar of California, and in response to an inquiry by a representative of the latter, petitioner stated that he had not collected any money on the account but would secure and forward a certified copy of the judgment. Petitioner explains this statement by saying that the Gressler claim was received in 1930 from Campagna; that he made an investigation and reported it to be uncollectible; that he put the Gressler correspondence into the same file as the Scheck claim, thus covering up the latter; and that he had completely forgotten the collections. However, after the hearing in the first charges and after the severe illness which followed the recommendation of the administrative committee, and through the aid of the lawyer for Scheck and the assistance of the bank, petitioner, in the latter part of August, 1933, discovered the payments and on August 26, forwarded to his client one-half, or $225. This amount was not satisfactory to Campagna, who demanded an additional $75 by reason of petitioner's willingness to accept $200 out of the compromise figure of $600. Petitioner subsequently remitted the further sum of $75. It should be added that petitioner further excuses himself for not reporting immediately after the collections were made by saying that until the total sum of $600 was paid by Scheck it was uncertain whether his fee would be $200 or one-half of the amounts collected. It was upon the theory that one-half belonged to him that the first check to Campagna was only for $225.

The findings are not, when properly read, in conflict with the testimony set forth. The committee did conclude that "respondent knew said amounts were received by his office and that he deliberately refused to report the collection of said sums or otherwise reply to his client, with the intent of deliberately and wilfully converting said sums to his own

use''. It is difficult to understand upon any other basis how it was possible for petitioner to enter judgment in the action after first giving credit for the amount collected, especially in view of his personal settlement of the controversy and his personal collection of the first payment. It is impossible for us to believe petitioner was acting in good faith when he first reported to a representative of The State Bar that he had collected nothing on the account. Aside from this, however, petitioner's excuse that he did not report the collection of $450 because he was waiting for the final payment is not valid. His duty ·as a lawyer required him to report punctually. Acting in accordance with this mandate he should have remitted at least the amount which was not questionable. Furthermore, it is not contradicted that in the present case he commingled the funds with his own. Considering the two cases together, it is manifest that petitioner has been lacking in that exactness and promptness which should characterize the conduct of attorneys when dealing with the money of their clients. Assuming that there was no deliberate attempt to convert the funds to his own use, it yet remains that he had been guilty of culpable negligence and carelessness. The primary purpose of disciplinary proceedings is not to punish the attorney but to protect the public against the unfit, and to keep the profession wholesome. Can it be seriously argued that an attorney who, in two different cases, fails, for almost two years in the one and for more than two years in the other, to account to his client for moneys collected, is sufficiently aware of his responsibilty ·to be entrusted to handle money for the members of the public? We think not. Some action must be taken to impress upon his mind that such conduct cannot be tolerated.

We have no doubt that petitioner has suffered acutely already. He points out to us by way of asking for leniency that immediately following the recommendation of the committee on the first charges he suffered a cerebral hemorrhage which confined him to the hospital and his home for about six weeks and which incapacitated him for sustained mental effort for months thereafter, and that, following the findings of the committee on the second charge, he was afflicted with coronary thrombosis which necessitated

his stay in the hospital and his home for several months. The board of governors gave consideration to these evidences of excruciating physical and mental suffering. Yet they, in effect, recommended a suspension of two and one-half years on both charges in view of the fact that the latter was to run consecutively with any other suspension. We entertain no doubt that the afflictions of petitioner touched the sympathy of the members of that board as they do ours, but the question still remains whether the petitioner's regard for his professional responsibility entitles him to practice law. Were it not for the mitigating circumstances we should feel compelled to permanently disbar him. As it is, we think the recommendation of the board should be adopted.

It is, therefore, the order that petitioner be suspended from the practice of the law for a period of two years and six months from and after the entry of this order.